UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| V | ) CRIMINAL NO. 20-MJ-7155-JCB |
| | ) |
| DAVID DESOUSA | ) |
| DEFENDANT | ) |

**DEFENDANT'S MOTION FOR DISTRICT COURT REVIEW AND REVOCATION OF ORDER OF DETENTION**

The defendant, David Desousa, moves pursuant to Title 18 § 3145, and respectfully requests that the District Court review and revoke the Order of Detention issued on August 12, 2020 and release the defendant on conditions. In support hereof the defendant states the following:

Procedural History:

On August 6, 2020 the defendant made his initial appearance on a one count complaint alleging a violation of 21 U.S.C. § 841(a)(1) –Distribution of Methamphetamine.  On August 12, 2020 after a hearing Hon. Jennifer Boal, issued an order to detain the defendant citing a criminal record, strength of the case against him, lengthy period of incarceration if convicted and criminal activity while out on release from the state court, and risk of flight.

Biographical Background

The defendant is 30 years old, single father of a 7 year old daughter. Defendant was born and raised Massachusetts and currently resides in Malden. The defendant has immediate family in the area including his mother, sister, grandparents and uncles. The defendant has a myriad of health issues including severe asthma which requires daily steroid treatment as well as a rescue inhaler.

1

Moreover, he suffers from Tourette Syndrome, which requires daily medication, and has been determined to be disabled as a result.

Argument

Generally, when reviewing a magistrate's order regarding pretrial detention, it is the duty of the district court to "undertake an independent review of the case." *United States v. DiGiacomo, 746 F.Supp 1176, 1181 (1990) citing United States v. Hurtado, 779 F.2d 1467, 1480 (1985).* A district judge must conduct a "de novo review" of a contested detention order issued by a magistrate judge. The district court must make an independent determination of the detention decision, unconstrained by the limits of the magistrate's conclusions or the record established in the original detention hearing. *United States v. Tortora, 922 F.2d 880 (1990)*

18 U.S.C. § 3142 allows that a criminal defendant may be detained pending trial only upon a determination that no condition, or combination of conditions, will reasonably assure the appearance of the person as required and the safety of any other person and the community. *United States v. Gray, 529 F.Supp.2d 177 (2007) citing United States v. Montalvo-Murillo, 495 U.S. 711, 110 S.Ct. 2072, 109 L.Ed.2d 720 (1990).*

Danger to the Community

In order to prevail in their attempt to detain a defendant based the defendant's danger to the community, the government must prove by clear and convincing evidence that no combination of conditions will reasonably assure the safety of any other person or the community. *United States v. DiGiacomo, at 18 U.S.C. § 3142(f)*. Also, the Government must make an individualized showing of dangerousness. *United States v. Patriarca, 948 F.2d 789 (1991)*

In rendering his decision in *DiGiacomo*, your Honor cited Judge Robert Keeton's decision in *United States v. Phillips, 732 F.Supp. 255, (1990), acknowledging:*

2

> Congress ... [chose] to use the term "danger" which by its nature is a risk concept. By using this term, Congress did not declare that the community is entitled to assurances of freedom from all harm, and a court cannot detain arrestees on the mere apprehension of danger of harm. Rather, the court's inquiry must focus on whether by conditions of release the community can *reasonably* be assured of its safety.  See  United States v. Orta, 760 F.2d 887, 892 (8th Cir.1985) (en banc).

*DiGiacomo, 746 F.Supp 1176 at 1181 (1990)*

In *DiGiacomo*, the Government sought to detain the defendants, Biagio DiGiacomo and Antonio Spagnolo, pending trial.  The defendants, were members of the Patriarca Crime Family of La Cosa Nostra.  DiGiacomo held the status of Capo Regime (Captain) and Spagnolo, a soldier.  The defendants were indicted on charges including violations of the Racketeering Influenced and Corrupt Organizations ("RICO") laws, possession and distributing of narcotics, extortionate credit transactions, subornation of perjury, obstruction of justice and wire and mail fraud.

The court acknowledged the defendants were charged with committing crimes of violence such as extortion and loan sharking.  Also, the court noted that the defendants were members of a criminal enterprise (Mafia) that routinely engaged in violence, intimidation of witnesses, and murder in the regular course of its illegal business.  Lastly, DiGiacomo was charged with attempting to obstruct justice by soliciting false testimony in connection with investigations concerning other individuals.

In denying that Government's request for detention, your Honor reasoned that the defendants' membership in the Mafia cannot properly be the end of the inquiry with regard to dangerousness or flight. Among other things, a defendant's role in the Mafia is relevant because leaders or individuals with the ability to direct the criminal activity of others pose a special threat to the safety of the community. *DiGiacomo, 746 F.Supp 1176 at 1182, citing United States v. Zannino, 798 F.2d 544, 547 (1986).*

3

> "In addition, accepting that Mafia membership at any level inherently entails a degree of dangerousness and, because of the far-flung nature of the organization, special risks of flight, the court must nevertheless consider whether there is a combination of conditions which can reasonably protect against the danger posed, directly or indirectly, by the particular defendant and reasonably assure that individual's appearance in court."

*DiGiacomo, 746 F.Supp 1176 at 1182*

In *United States v. Phillips, supra* the five defendants were alleged to be members of a street gang that were engaged in an ongoing dispute with a rival gang. The defendant, Devon Brown, was charged with one count of being in Felon in Possession of a Firearm. It was alleged that the weapons at issue in the case were brought into Massachusetts by the defendants to arm themselves against their rivals, the Intervale Street gang. In addition, Brown had several previous state convictions including drug possession offenses, possession of cocaine with intent to distribute, possession of a sawed-off shotgun, possession of a shotgun and ammunition without a firearm identification card, and receipt of stolen property.

In revoking the Magistrate Judges Order of Detention as to the defendant (Brown) Judge Keeton reasoned that "A finding of dangerousness, however, must ultimately be based on the evidence regarding the particular defendant before the court, and not on evidence regarding types of circumstances, or groups or types of defendants who are like the individual defendant before the court in some way other than those identified in the statute." *United States v. Phillips, id at 8*

Here, the defendant has no prior record of convictions. The Government cannot show by clear and convincing evidence that the defendant poses a danger to the community. The release of the defendant on conditions such as home detention, electronic monitoring and ability to leave his residence only for the purpose of appointments with counsel and medical visits, is more than adequate to ensure the safety of the public in general and any potential witness in the case.

Risk of Flight

Although the decision to detain the defendant included a finding that there was a risk of nonappearance, it seems to be based solely the potential sentence the defendant would receive if convicted.  In analyzing risk of flight as a basis for detention, the Government must prove by a preponderance of the evidence that no combination of conditions will reasonably assure the defendant's appearance at future court proceedings.  The burden of persuasion remains with the Government on the question of flight risk.  *DiGiacomo, 746 F.Supp 1176 at 746 (1990)*.

As stated above the defendant is 30 years old, single father of a 7 year old daughter and was born and raised Massachusetts and currently resides in Malden. The defendant has immediate family in the area including his mother, sister, grandparents and uncles.  Moreover, the defendant has a myriad of health issues including severe asthma which requires daily steroid treatment as well as a rescue inhaler. Moreover, he suffers from Tourette Syndrome, which requires daily medication, and has been determined to be disabled as a result.

The defendant has no ties outside the community that could sustain him should he chose to attempt to run. Moreover, the defendant does not have the financial means to allow him to flee the jurisdiction or sustain any type of extended departure from home. Plainly stated the defendant does not have the ability, financial or otherwise, to flee and hide from the instant matter.

Accordingly, the Government cannot show by a preponderance of the evidence that the defendant is a risk of flight and will not return to court.

COVID -19

The defendant is a pretrial defendant currently detained at the Wyatt Federal Detention Center ("Wyatt"), is within the group of people the Centers for Disease Control and Prevention

("CDC") has categorized as most-at-risk for contracting COVID-19, a dangerous illness spreading rapidly across the world and Rhode Island.

The Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3 142(i). Desousa is a "higher risk of severe COVID-19 if he becomes infected" (Exhibit A) due to his condition of asthma, smoking and chronic tonsillitis. The defendant sought emergency medical care for complications due to his asthma on January 11, 2020, January 13, 2020 and February 25. 2020.

During this pandemic the primary precautionary measures are designed to keep people out of crowded places and to require "social distancing" to lessen the spread of the virus because it is highly contagious. The Centers for Disease Control and Prevention ("CDC") advise that the virus passes through coughing and by contact with surfaces.[1] New data published in the New England Journal of Medicine found that the highly-contagious "virus can remain viable and infectious in aerosols for hours and on surfaces up to days."[2] To combat transmission, the CDC has issued guidance discouraging gatherings of more than 10 people in one place.[3] The CDC also urges social distancing—every person should remain at a distance of at least six feet from every

---

[1] *See* "How It Spreads," Center for Disease Control and Prevention (last accessed 03/21/2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

[2] Neeltje van Doremalen, et. al, Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1, New England J. Med., (March 17, 2020), nejm.org/doi/10.1056/NEJMc2004973.

[3] Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission, Center for Disease Control and Prevention, 3 (Mar. 12, 2020) available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf.

other person.[4] Proper hygiene, including frequent cleaning of all surfaces and frequent, thorough hand washing is also recommended.

### A. COVID-19 Presents An Even Worse Threat In High-Risk Settings Like Jails.

The recommended measures for mitigating the spread of COVID-19 are not readily available for incarcerated inmates or those who must interact with them. Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. In prison people are confined in close proximity to one another and to the staff.  When people must share sleeping areas, dining halls, bathrooms, showers and other common areas, the opportunities for transmission are greater.

In addition, there are reduced opportunities to apply necessary hygiene measures, as jails and prisons are often under resourced and ill-equipped. Compounding the problem, many people who are incarcerated also have chronic underlying health conditions, like asthma, diabetes, hypertension or HIV, that place them at elevated risk for contracting serious COVID-19. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in federal pretrial detention centers.[5]

The Donald W. Wyatt Detention Facility houses 767 male prisoners and 40 female prisoners.[6] Wyatt is no different than a cruise ships or nursing homes and other confined places

---

[4] *See* supra note 7; see also Lisa Maragakis, "Coronavirus, Social Distancing, and Self-Quarantine," John Hopkins Univ. (last accessed March 21, 2020) https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine.

[5] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, at https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[6] See History of the Facility, Donald W. Wyatt Detention Facility, available at

where the virus has proven to run rampant. The facility is an environment in which the COVID-19 virus can easily gain a foothold and, when it does, spread rapidly jeopardizing the life and safety of the Defendant. Many experts agree that there will be another surge in the virus during the upcoming fall months. And according to health experts, incarcerated individuals are at a greater risk of infection given their living situations and are likely to be hindered in the ability to avail themselves of proactive measures to keep themselves safe.

Due to the great risk of contracting the virus and higher risk of severe complications of COVID-19 if infected, release from custody based on the serious health issues and other risk factors facing this defendant, including asthma, smoking and chronic tonsillitis release on terms as recommended by pre-trial services and herein,

## LEGAL ARGUMENT

A "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States Marshals or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). *See also United States v. Angiulo*, 755 F.2d 969, 972-73 (1st Cir. 1985) (holding that the magistrate who issues a detention order has inherent authority to reconsider that order). Compelling reasons may exist where release is necessary when a defendant serious medical conditions warrant release, *see, e.g., United States v. Rebollo-Andino*, 312 F. App'x 346, 348 (1st Cir. 2009) (explaining that a defendant who is denied bail "retains the ability to request[,] . . . in extraordinary circumstances, . . . temporary release under § 3142(i)" should future developments with respect to his medical conditions so warrant).

---

http://www.wyattdetention.com/About-Us/History.

Even in cases where there is a presumption of dangerousness, release may be appropriate to safeguard a defendant's health and life. *See, e.g*, *Id*. *See also United States v. Cordero Caraballo*, 185 F. Supp. 2d 143, 146 (D.P.R. 2002) (defendant charged with assaulting and attempting to kill federal agent released to custody of his relatives because "[n]otwithstanding the defendant's apparent dangerousness in this case, his present condition is indeed grave and can deteriorate if not carefully treated. At present, the Bureau of Prisons cannot provide the necessary medical care defendant requires."); *United States v. Johnston*, 2017 WL 4277140 (D.D.C. Sept. 27, 2017) (defendant charged with violation of the Mann Act and in need of prompt treatment due to colon cancer released to custody of his wife for 21 days, despite institution's averment that it could provide medical care); *United States v. Adams*, 2019 WL 3037042 (D. Or. July 10, 2019) (defendant charged with violation of the Mann Act and possession of child pornography and suffering from diabetes, heart conditions and open sores released on home detention because of his medical conditions).

Thus, this Court should consider the "total harm and benefits to prisoner and society" that continued pretrial imprisonment of the defendant will yield, relative to the heightened health risks posed to the defendant during this pandemic. *See generally United States v. D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016) (Weinstein, J.)

**There Are Conditions of Release That Both Reasonably Assure The defendant is not a flight risk and to protect the community.**

The Bail Reform Act requires the Court to impose "the least restrictive [] condition, or combination of conditions, that [it] determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). The defense initially, and maintains the same request, asked the court to release

the defendant on the condition as proposed by pre-trial services. However, the defendant submits that there are conditions of release that can be crafted in this case, specifically the addition of home detention with electronic monitoring. These conditions will mitigate any risk of flight or danger that the defendant may pose, while allowing him to remain isolated in a home-setting. The defendant poses no risk of danger to the community while on home-detention coupled electronic monitoring.

Proposed Conditions

1. Be fitted with a GPS monitoring bracelet.
2. House arrest with release only for medical and legal appointments.
3. Surrender Passport
4. The defendant to post a personal surety bond.

                                            Respectfully Submitted,
                                            David Desousa
                                            By counsel

                                            */s/ Carmine P. Lepore*
                                            Carmine P. Lepore
                                            Lepore & Hochman, P.A.
                                            One Sprague Street
                                            Revere, MA 02151
                                            (781) 286-8800
                                            BBO# 564603

September 24, 2020


## CERTIFICATE OF SERVICE

I, Carmine P. Lepore, hereby certify that the above document was filed through the Electronic Court Filing system and served on all registered participants on September 24, 2020

                                            */s/ Carmine P. Lepore*