UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 20-10268-RGS |
| | ) | |
| DAVID DESOUSA | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO SUPPRESS**

On November 10, 2020, the defendant was indicted in six counts of drug trafficking.  Doc. 40. Counts One through Three relate to sales of methamphetamine that the defendant made directly to an undercover law enforcement officer ("UC"). Count Four relates to a quantity of methamphetamine that was seized by investigators from the vehicle that the defendant was operating on August 6, 2020. Count Five relates to methamphetamine seized in plain view by investigators on August 6, 2020 during the execution of a federal search warrant at the defendant's apartment, and Count Six relates to drugs seized by investigators on August 6, 2020 during the execution of a second federal search warrant at a storage unit rented by the defendant.

On July 22, 2021, the defendant filed a motion to suppress evidence seized from his apartment and storage unit and a memorandum in support of his motion. *See* Doc. 68, 69 (hereinafter, "Motion to Suppress"). For the reasons discussed below, the defendant's claims are without merit, and his motion should be denied.

**FACTUAL BACKGROUND**

The details of the defendant's drug trafficking activities are set forth in great detail in the two affidavits of DEA Task Force Officer ("TFO") Brian Connerney. TFO Connerney submitted

the first affidavit to support application for multiple search warrants, one of which was a search warrant for the defendant's apartment (hereinafter, the "Apartment Affidavit"). *See* Motion to Suppress, Doc. 69-2. On August 6, 2020, after the defendant was arrested and searches had been conducted, TFO Connerney submitted a second affidavit in support of an application for a search warrant for the defendant's storage unit (hereinafter, the "Storage Unit Affidavit"). *See* Motion to Suppress, Doc. 69-4. To avoid needless reiteration, inasmuch as specific citations to the affidavits bear upon the issues challenged by the defendant, the facts discussed in the Apartment Affidavit and Storage Unit Affidavit are delineated in detail in the relevant Argument section below.

## SUMMARY OF ARGUMENT

On August 6, 2020, investigators executed a lawfully-issued federal search warrant at the defendant's apartment at 557 Pleasant Street, Apartment 523, Malden, Massachusetts (the "apartment") and seized evidence of the defendant's drug trafficking.  During the execution of the search warrant, officers seized a quantity of methamphetamine that was in plain view within the apartment.

The Apartment Affidavit established probable cause to believe that the defendant stored records and the fruits of his drug dealing at his apartment. The Apartment Affidavit detailed a long-term investigation involving controlled purchases of methamphetamine from the defendant by the UC between February 2020 and July 2020. In connection with each controlled buy, investigators either observed the defendant leaving from his apartment en route to meeting with the UC or they observed the defendant returning to his apartment after the sale of methamphetamine to the UC. The Apartment Affidavit further established that the defendant resided in his apartment and that the defendant's financial records were mailed there. The facts

clearly established probable cause to believe that evidence of the defendant's drug trafficking activities would be found in his apartment.

On August 6, 2020, investigators also seized evidence of the defendant's drug trafficking (including a quantity of methamphetamine) pursuant to a federal search warrant issued for the defendant's storage unit at 490 Eastern Avenue, Unit 3266, Malden, Massachusetts (the "storage unit"). The Storage Unit Affidavit incorporated by reference and attached the Apartment Affidavit. Doc 69-4, ¶ 12-13. The Storage Unit Affidavit detailed the defendant's visit to his storage unit on August 6, 2020 immediately before the defendant was scheduled to meet with the UC to sell methamphetamine to the officer. The Storage Unit Affidavit also discussed the fact that investigators stopped the defendant's vehicle after the defendant left the storage unit and texted the UC to inform the UC that he was en route and that investigators seized various quantities of suspected methamphetamine and cocaine base from the defendant's vehicle.  There was ample probable cause to believe that drugs, money, and evidence of the defendant's drug dealing would be found in the storage unit.

Furthermore, even if the Court were to determine that the Apartment Affidavit or Storage Unit Affidavit failed to establish probable cause, the good-faith exception applies because agents reasonably relied on a court-authorized search warrant, issued by a detached and neutral magistrate.

I.     **The Apartment Affidavit Clearly Established Probable Cause to Search the Apartment**

As the First Circuit has "repeatedly emphasized, '[a]n affidavit supporting a search warrant is presumptively valid." *United States v. McLellan,* 792 F.3d 200 (1st Cir. 2015) *cert. denied*, 136 S. Ct. 494 (2015) (quoting *United States v. Gifford*, 727 F.3d 92, 98 (1st Cir. 2013)). "Where, as

here, a search is conducted pursuant to a warrant, the burden falls to the defendant to show the absence of probable cause by a preponderance of the evidence." *United States v. Heyer*, No. CR 15-10256-RGS, 2018 WL 6834591, at *1 (D. Mass. Dec. 27, 2018).

In this case, the magistrate judge found probable cause based on the Apartment Affidavit, and this determination is subject to great deference. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Gonzalez-Arias*, 946 F.3d 17, 23 (1st Cir. 2019) ("We… must give 'considerable deference to reasonable inferences the issuing magistrate may have drawn from the facts set out in the affidavit supporting the DEA's application for the search warrant, reversing only if the affidavit contained no 'substantial basis for concluding that probable cause exited.'"") (quoting U*nited States v. Zayas-Diaz*, 95 F.3d 105, 111 (1st Cir. 1996). When a court reviews a warrant issued by a magistrate, its duty "is simply to ensure that the magistrate had a 'substantial basis for . . . [concluding]' that probable cause existed." *Gates*, 462 U.S. at 238-39 (citing *Jones v. United States*, 362 U.S. 257, 271 (1960)).   A reviewing court accords "considerable deference to reasonable inferences the [issuing judge] may have drawn from the attested facts." *United States v. Tiem Trinh*, 665 F.3d 1, 10 (1st Cir. 2011) (quoting *Zayas–Diaz*, 95 F.3d at 111). The Court's review is restricted to the sufficiency of the affidavit on which the warrant was issued. *See Gates*, 462 U.S. at 239.

Search warrants "must demonstrate probable cause to believe that (1) a crime has been committed – the 'commission' element, and (2) enumerated evidence of the offense will be found at the place searched – the so-called 'nexus' element." *United States v. Dixon*, 787 F.3d 55, 59 (1st Cir. 2015), *cert. denied,* 136 S. Ct. 280, 193 L. Ed. 2d 204 (2015) (citations omitted). The existence of probable cause is determined by evaluating the totality of the circumstances. *Gates,* 462 U.S. at

231; *see also Gifford*, 727 F.3d at 98 ("Probable cause exists when the totality of the circumstances suggests that 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"). The determination "does not demand proof beyond a reasonable doubt." *United States v. Coombs*, 857 F.3d 439, 446 (1st Cir. 2017). Rather, the government need only establish a "fair probability" or a "reasonable likelihood" that evidence of a crime will be found. *United States v. Rivera*, 825 F.3d 59, 63 (1st Cir. 2016). "[W]hile underlying circumstances must be recited, affidavits should be construed in a commonsense manner and ... doubtful cases should be resolved in favor of the warrant." *Heyer*, No. CR 15-10256-RGS, 2018 WL 6834591, at *1. (quoting *Rosencranz v. United States*, 356 F.2d 310, 316 (1st Cir. 1966)).

The Apartment Affidavit in this case described in detail how investigators conducted three controlled purchases of methamphetamine from the defendant beginning in February 2020. On February 26, 2020, the defendant sold methamphetamine to the UC in an audio and video recorded meeting. The defendant drove to the drug deal in a vehicle registered to his apartment. Following the controlled purchase, officers observed the defendant return to his apartment building. Apartment Affidavit at ¶¶ 14-18. Starting in February, agents had reason to believe that the defendant's vehicle records and drug proceeds would be found in the defendant's apartment. The investigation, however, did not stop there.

On March 12, 2020, the defendant again sold methamphetamine to the UC in a recorded meeting. Prior to the meeting, the defendant informed the UC that he needed to "head to my spot (slang meaning, his residence)" to obtain the UC's drug order. Apartment Affidavit at ¶ 19. Investigators, now knowing the defendant's residence, surveilled the defendant's apartment building. Officers observed the defendant arrive outside and enter his apartment building. *Id.* at

¶ 20. A few minutes later, the defendant left his apartment building and met the UC for the controlled purchase. *Id.* The logical inference—consistent with the defendant's own statements to the UC—was that the defendant went to his apartment and retrieved the drugs that he then delivered and sold to the UC. *Id.* Now, agents had reason to believe the defendant also stored drugs and drug packaging materials at his apartment.[1]

Around the time of the March 2020 controlled purchase, the world, including Massachusetts, came to a halt with the COVID-19 pandemic.[2] Unsurprisingly, enforcement operations were also disrupted. Yet, the defendant appeared undeterred by the global shutdown because GPS data from his vehicle from May 2020 to July 2020 showed a pattern of brief meetings across southern New England, which TFO Connerney believed were consistent with hand-to-hand drug transactions. *Id.* at ¶¶ 25-33.[3] The GPS device on the defendant's vehicle and physical

---

[1] The Apartment Affidavit did not seek to search for drugs, but rather records of drug dealing (ledgers, text or email messages, etc.), ownership records (storage unit records, leases, etc.), financial documents (bank records, vehicle title, etc.), drug proceeds (cash, jewelry, etc.), and the contents of the defendant's cellphone.

[2] https://www.nbcboston.com/news/local/26-new-coronavirus-cases-in-massachusetts-164-total/2091478/ (last accessed August 3, 2021).

[3] The Supreme Court has observed that "a police officer views the facts through the lens of his police experience and expertise. . . . when seen together . . . [facts and expertise] yield inferences that deserve deference." *Ornelas v. United States*, 517 U.S. 690, 699 (1996). Similarly, the First Circuit "with a regularity bordering on the echolalic, [has] endorsed the concept that a law enforcement officer's training and experience may yield insights that support a probable cause determination." *United States v. Floyd*, 740 F.3d 22, 35 (1st Cir. 2014). In *United States v. Thompson,* the court noted that an officer's "statement, drawn from his or her training and experience," is a legitimate factor when considering to uphold a search warrant. 630 F. Supp. 2d 138, 143 (D. Mass. 2009).

surveillance by officers confirmed that the defendant continued to reside in the apartment. *Id.* at ¶¶ 27-29, 32.

By July 2020, Massachusetts began re-opening and with that came renewed enforcement operations.[4] On July 29, 2020, the UC was able to re-engage with the defendant and order more methamphetamine. Apartment Affidavit at ¶¶ 34-36. In communications setting up the proposed deal, the defendant informed the UC that he was continuing to sell methamphetamine to customers and discussed how prices had increased dramatically. *Id.* at ¶ 35. The defendant informed the UC that he would "meet 2 people first" before meeting the UC for the controlled purchase. *Id.* Surveillance officers then observed the defendant leave his apartment building and meet with several individuals for brief exchanges, consistent with hand-to-hand drug transactions, before the defendant proceeded to meet with the UC. *Id.* at ¶ 37. Once again, the fair inference of the defendant's conduct—consistent with his own statement to the UC about meeting "people first"— was that the defendant took drugs from his apartment and delivered those drugs to other customers before meeting with the UC. *Id.*

In his Motion to Suppress, the defendant argues it is *"plausible"* that one of these brief meetings was with his supplier. Motion to Suppress at 7. The fact that there may be an alternative explanation for the defendant's conduct, however, does not negate the magistrate judge's conclusion of probable cause. "Probable cause means "reasonable cause," something significantly less exacting than "more likely than not" or "by a preponderance of the evidence." Probable cause

---

[4] https://www.nbcboston.com/news/local/mass-gov-baker-to-provide-coronavirus-update-4/2152686/ (last accessed August 3, 2021).

"merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." *United States v. Soto*, 779 F. Supp. 2d 208, 220–21 (D. Mass. 2011) (citations omitted). Given the scope of the investigation, the affiant made a reasonable inference that the defendant was meeting with additional drug customers before meeting with the UC. Apartment Affidavit at ¶ 37. Whether the defendant might now concoct an alternative explanation that is plausible (*i.e,* that the defendant might have been meeting with his supplier *before* meeting with the UC) is beside the point.  The operative inquiry ultimately is simply whether the affiant submitted evidence establishing probable cause that the defendant maintained evidence of his drug trafficking activities within his residence.[5]

Ultimately, on July 29, 2020, the defendant met with and sold methamphetamine to the UC in a recorded drug deal. During this meeting, the UC asked the defendant for two to three ounces of methamphetamine for the following week. The defendant agreed that he could supply that amount. Apartment Affidavit at ¶ 38.

The Apartment Affidavit sought not only to search for evidence of the defendant's drug dealing activities, but also his money laundering efforts. Apartment Affidavit at ¶ 9. The defendant had his bank records mailed to his apartment, which reflected $95,770 of peer-to-peer transfers

---

[5] This is particularly true, here, where as previously noted (*supra* at n.1), the search warrant of the defendant's apartment authorized the seizure of evidence relating to the defendant's drug trafficking activities—not drugs (which were ultimately seized in plain view during the execution of the warrant).

from various payment processors over the course of two years and three months. *Id.* at ¶ 40. The defendant's bank records also showed no deposits from wages. *Id.* at ¶ 42. Agents had probable cause to believe that the cash deposits and peer-to-peer payments going to the defendant's bank account were from his drug distribution activities. *Id*. Further, the bank records do not show who made peer-to-peer payments to the defendant, only the payment vendor. Agents had probable cause to believe that records of who paid the defendant would be found in his apartment or on electronic devices within the apartment.

The defendant further purchased a vehicle with an initial $18,000 cash down payment (through cashier's checks). *Id.* at 41. Despite having a six-year repayment window, the defendant paid the balance of his vehicle loan in three months. *Id*. These payments were made following structured cash deposits under $10,000 to avoid financial reporting requirements. Agents had probable cause to believe that the defendant financed his vehicle through his drug business. Further, given that his vehicle loan statements were mailed to his apartment, agents had probable cause to believe that evidence of this money laundering activity would be found in his apartment or on electronic devices located at his apartment.

The evidence detailed above was more than sufficient to establish probable cause to believe that evidence of the defendant's drug dealing would be found in his apartment. The probable cause nexus between enumerated evidence of a crime and a place "can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment, and normal inferences as to where a criminal would hide [evidence of a crime]." *United States v. Ribeiro*, 397 F.3d 43, 49 (1st Cir. 2005) (citing *United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir. 1979)).  The First Circuit has observed that "in drug cases, there is often probable cause to

believe that evidence of the crime will be found where the suspected drug dealer lives." *Dixon*, 787 F.3d at 60. Here, the Apartment Affidavit detailed the link between the defendant's drug distribution and his apartment, as well as how the affiant's training and experience led him to believe that the defendant used his apartment to keep records of his drug dealing and money laundering activities. *See* Apartment Affidavit at ¶¶ 43-51. From this information, the magistrate had a "substantial basis" to conclude that "there [was] a fair probability that contraband or evidence of a crime," existed in the defendant's apartment. *Gates*, 462 U.S. at 238. This principle is also exemplified in *United States v. Ribeiro*. In *Ribeiro*, law enforcement watched the defendant sell drugs to an undercover officer four times. *See Ribeiro*, 397 F.3d at 49-50. Surveillance officers were only able to follow the defendant from his residence for one of these sales. The First Circuit, however, noted that the nexus requirement was supported by the investigator's assessment that drug dealers often stored their drugs and other evidence in their homes. *Id.* at 50-52.

The defendant's quick response time to each of the UC's requests for drugs and travel from his apartment to the deal during two of the three controlled purchases implied he had a "readily accessible supply of narcotics" and likely stored drugs, cash, and evidence of his drug trade in the apartment. *United States v. Hicks*, 575 F.3d 130, 137 (1st Cir. 2009); *see, e.g., United States v. Thompson*, 630 F. Supp. 2d 138, 144 (D. Mass. 2009) ("on two occasions police observed Thompson leave the residence and proceeded directly to locations where drug transactions took place . . . clear inferences that, on those occasions, Thompson already had drugs with him when he left [the residence]"); *see also United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986) (stating that "in the case of drug dealers, evidence is likely to be found where the dealers live"). Based on these facts, the magistrate came to the common-sense conclusion that probable

cause existed to infer the defendant used his apartment as a base of operation for his drug business, including keeping money and records of his drug dealing there. *See Thompson*, 630 F. Supp. 2d at 144; *United States v. Rivera*, 825 F.3d 59 (1st Cir. 2016) ("[c]ommon sense says that when a criminal peddles narcotics outside his home, one can infer that evidence of his drug dealing activity will be found in the home, at least when he is spotted leaving the home immediately prior to selling drugs.") (citing *United States v. Barnes*, 492 F.3d 33, 37 (1st Cir. 2007)).

## II.   <u>The Evidence Relied Upon in the Apartment Affidavit Was Not Stale</u>

The defendant also argues that the evidence described in the Apartment Affidavit was too stale to support probable cause for the search of his apartment. Yet, the Apartment Affidavit lays out a pattern of controlled purchases from February 26, 2020 to July 29, 2020 that link back to the defendant's apartment. The July 29, 2020 controlled purchase detailed that the defendant left his apartment prior to meeting the UC for a controlled purchase of methamphetamine. Eight days after this controlled purchase, the Apartment Affidavit was submitted in support of a search warrant for the apartment. When evaluating a claim of staleness, the Court does "not measure the timeliness of information simply by counting the number of days that have elapsed." *United States v. Morales-Aldahondo*, 524 F.3d 115, 119 (1st Cir. 2008).  Rather, the Court "must assess the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information." *Morales-Aldahondo*, 524 F.3d at 119. The Supreme Court has supported this position stating: "faulting the police for failing to apply for a search warrant at the earliest possible time after obtaining probable cause imposes a duty that is nowhere to be found in the Constitution." *Kentucky v. King*, 563 U.S. 452, 467 (2011).  Here, the evidence supported that the defendant was using his apartment as a base of operation for several months. The Apartment

11

Affidavit further detailed physical surveillance of the defendant on June 10, 2020 consistent with him making trips from his apartment to brief meetings consistent with hand-to-hand drug deals.

The inferences drawn to support probable cause need not be inevitable, only reasonable. *United States v. Drake*, 673 F.2d 15, 18-19 (1st Cir. 1982) ("The issue is whether the affidavit conveyed sufficient facts to enable the magistrate reasonably to infer a likelihood that methamphetamine was being manufactured illicitly on the premises to be searched… this is all that the fourth amendment requires."). A magistrate may find probable cause to believe that evidence is in a suspect's residence by using commonsense inferences about where a criminal would hide evidence of his crime. *See Gonzalez-Arias*, 946 F.3d at 24. It was reasonable to infer that the defendant used his apartment as a base of operations in February and March 2020, and continued to do so on July 29, 2020 when he left his apartment and made several hand-to-hand transactions before the controlled purchase with the UC. The First Circuit has "repeatedly found probable cause to search a defendant's home when agents spotted him leaving the home immediately prior to selling drugs elsewhere." *Gonzalez-Arias*, 946 F.3d at 24.

This case is readily distinguishable from *United States v. Chalas*, where the affidavit detailed a one-off collaboration with a co-conspirator at the defendant's residence, six weeks prior to the application for the search warrant. 478 F.Supp.3d. 143, 151 (D. Mass. 2020) (Stearns, J.). As this Court expressly noted in that decision: "[I]f an affidavit recites activity indicating protracted or continuous conduct, time is of less significance." *Chalas*, 478 F.Supp.3d. at 148. Here, the defendant engaged in a continuing pattern of drug distribution across several months, all involving his apartment. The probable cause that he used his apartment for his drug business did

not dissipate in the eight days between the last controlled purchase and the application for the warrant, particularly when the affidavit detailed six months of his continued use of the apartment.

**III.**   **The Storage Unit Affidavit Clearly Established Probable Cause to Search the Storage Unit**

On the day of the defendant's arrest, August 6, 2020, agents arranged a controlled purchase of two ounces of methamphetamine from the defendant. The defendant conveyed to the UC that he would need to stop by his apartment to obtain the drugs. Storage Unit Affidavit at ¶ 14. Following the conversation with the UC, officers observed the defendant leave his mother's house in Saugus and arrive at the building of his storage unit (described as Target Location 2 in the affidavit). Officers had not previously known about this storage location, but soon surmised that it was one of the defendant's stash locations.

The defendant left the building of the storage unit and did not stop at his apartment. Storage Unit Affidavit at ¶ 16. Rather, the defendant left Malden and entered Medford, towards the location of the controlled purchase in Arlington. *Id*; *see also* map of the area attached as Exhibit A. Agents reasonably believed that the defendant obtained drugs for the UC from his storage unit, rather than from his apartment. Storage Unit Affidavit at ¶ 16. In Medford, agents executed the arrest and search warrant for the defendant's vehicle. Agents seized the expected two ounces of methamphetamine from the center console of the defendant's vehicle. Agents also seized additional narcotics and the defendant's cellphone from his vehicle. *See generally id.*

Pursuant to the search warrant for the defendant's vehicle, agents searched the defendant's cellphone. Storage Unit Affidavit at ¶ 17. From the cellphone, agents read an email showing his control of the storage unit. *Id*. To further their investigation, an officer spoke to an

13

employee at the storage location who reviewed surveillance footage and identified the defendant accessing his storage unit prior to his arrest. *Id.* at 18.

In his challenge to the Storage Unit search warrant, the defendant argues that he could have been at the storage unit for some innocent purpose. Motion to Suppress at 5. The more reasonable inference is that the defendant left his mother's house and went to a stash location to retrieve methamphetamine to fulfill the UC's order. It was reasonable for the magistrate judge to believe the defendant stored drugs, proceeds, and other evidence of his drug distribution in that storage unit. Nothing in this case, or commonsense, made it unreasonable to believe the defendant had multiple stash locations, a smaller stash at his residence (to mitigate his exposure should he be robbed or his residence searched by law enforcement) and a larger stash at an off-site location. *See United States v. Fletcher,* No. 15-10393-RGS, 2017 WL 5585716 (D. Mass. Nov. 20, 2017) (Stearns, J.) (upholding search warrant for the search warrant of an experienced drug trafficker: "Significant authority supports the inference that an established drug dealer is likely to keep drugs, proceeds, and records of drug dealing on premises over which he has control.")

## IV.   **The Good-Faith Exception**

As discussed above, both affidavits clearly established probable cause to search the apartment and storage unit, however, even if the Court found otherwise, suppression is not warranted.  In *United States v. Leon*, the Supreme Court held that evidence found to be unsupported by probable cause is nevertheless admissible when obtained by officers acting in reliance on a warrant issued by a detached and neutral magistrate.  468 U.S. 897 (1984).  "[The] exclusionary rule is designed to deter police misconduct rather than [] punish the errors of judges and

magistrates." *Leon*, 468 U.S. at 916. The exclusionary rule is applicable only where the need to deter unlawful government action outweighs its substantial costs—that is, where officers "exhibit 'deliberate,' reckless' or grossly negligent' disregard for Fourth Amendment rights." *United States v. Levin,* 874 F.3d 316, 322 (1st Cir. 2017) (quoting *Davis v. United States,* 564 U.S. 229, 238 (2011).

"In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or [her] judgment that the form of the warrant is technically sufficient." *Leon,* 468 U.S. at 921. The test is "whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922, n. 23. The defendant makes no such claim here.

"Evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Id.* at 921 (citing *United States v. Peltier*, 422 U.S. 531, 542 (1975)). A search is unconstitutional if the magistrate or judge issuing a warrant is misled by information in an affidavit that the affiant knew or should have known was false, or the affidavit "is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923 (citing *Franks v. Delaware*, 438 U.S. 154 (1978)).

Such is not the case here, where the Apartment Affidavit recounted three controlled purchases, physical surveillance, GPS electronic surveillance, financial records supporting suspicion of the defendant's money laundering, and other evidence supporting that he resided in the apartment. The Storage Unit Affidavit similarly described the setup to a controlled purchase, including recorded communications discussing the defendant's need to stop by his house to

15

retrieve the quantity of drugs ordered, as well as surveillance, and GPS data that support a finding of probable cause. Additionally, there are no allegations of intentional or reckless misstatements in the affidavits.

Here, the defendant does not argue that the magistrate wholly abandoned her judicial role, failed to particularize the place searched and items to be seized, or was misled by information the affiant knew was false. *See* Motion to Suppress. The defendant's only assertion here is that the affidavits so lacked the requisite indicia of probable cause that no reasonable officer could rely on it. *Id*. at 8. That argument is simply not supported by the facts, and therefore, even if the Court were to determine that the evidence in the affidavits lacked probable cause, nexus, or were overly stale, the evidence should not be suppressed.

## <u>CONCLUSION</u>

For the forgoing reasons, the government requests that this Court deny the defendant's motion to suppress all evidence seized at the defendant's apartment and storage unit. Further, the government submits that there is no reason for an evidentiary hearing, as the motion must be resolved on the "four corners of the affidavit."

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By:   */s/ Philip C. Cheng*
Philip C. Cheng
James E. Arnold
Assistant United States Attorneys

Dated: August 5, 2021

## <u>CERTIFICATE OF SERVICE</u>

I certify that I caused a copy of the foregoing document to be served via the ECF system on all counsel of record.


By:   */s/ Philip C. Cheng*
       Philip C. Cheng
       Assistant United States Attorney

Dated: August 5, 2021