UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 20-10268-RGS

UNITED STATES OF AMERICA

v.

DAVID DESOUSA

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS

December 7, 2021

STEARNS, D.J.

Defendant David Desousa is charged with six counts of possession and distribution of methamphetamine, in violation of 21 U.S.C. § 841. Desousa seeks to suppress physical evidence seized on August 6, 2020, from his Malden home and from a storage unit rented in his name. After oral argument and a careful review of the parties' briefs, the court will deny the motion to suppress.

## BACKGROUND

On February 25, 2020, an undercover law enforcement officer (UC) texted Desousa inquiring about purchasing a quantity of methamphetamine. Connerney Aff. I (Dkt # 69-2) ¶ 13. The following day, the UC arranged and

executed a controlled buy of methamphetamine from Desousa. *Id.* ¶¶ 15-16. After the buy, a surveillance officer observed Desousa return immediately to his home. *Id.* ¶ 18.

Investigators analyzed the records of Desousa's Bank of America checking account for the period from December 9, 2017, to March 11, 2020. *Id.* ¶ 40. During these approximate two and a quarter years, deposits into Sousa's checking account totaled $212,629, including $75,179 in cash and $95,770 in electronic peer-to-peer transfers through various mobile payment services including Zelle, Paypal, and Venmo. *Id.* Disbursements from Desousa's checking account totaled $203,787. *Id.* Desousa's bank account reflected no deposits from wage earnings or other legitimate sources during this period. *Id.* ¶ 42. The mailing address for Desousa's account statements was at all times in his Malden residence. *Id.* ¶ 40. Investigators believed the flow of cash into and out of Desousa's account to be consistent with "money laundering activities to conceal evidence of his drug proceeds." *Id.* ¶ 42.

On March 12, 2020, the UC again arranged for a controlled purchase of methamphetamine from Desousa. *Id.* ¶ 19. Desousa informed the UC that he needed to "head to [his] spot" to obtain the UC's drug order because he did not "carry that much on" him. *Id.* An investigator witnessed Desousa

make a four-minute stop at his home before traveling to the site where the purchase took place. *Id.* ¶ 20.

Between May and July of 2020, investigators observed Desousa regularly driving his vehicle to different locations throughout Massachusetts and Rhode Island, making brief stops consistent with Desousa's calling on customers to carry out hand-to-hand drug transactions. *Id.* ¶¶ 25-33.

On July 29, 2020, the UC contacted Desousa for a third time, once more seeking to buy methamphetamine. *Id.* ¶ 34. Prior to traveling to the agreed-upon purchase location, Desousa left his home and conducted "three separate, brief meetings during which he engaged in quick hand-to-hand transactions with three different individuals." *Id.* ¶ 37. Thereafter, the UC and Desousa completed the arranged purchase. *Id.* ¶ 38.

On August 6, 2020, the government sought a search warrant for Desousa's home and vehicle, *id.* ¶ 63, which Magistrate Judge Boal issued the same day. *See* Warrant I (Dkt # 69-1) at 1, 3-4 (seeking, *inter alia*, tangible evidence of drug distribution including financial records, ledgers, receipts, and currency counting machines). After obtaining the warrant (Warrant I), an investigator – using the UC's phone – texted Desousa and arranged for a further purchase of methamphetamine. Connerney Aff. II (Dkt # 69-4) ¶ 14. Desousa told the investigator that he was going to stop at

his home prior to the buy. *Id.* Desousa did not return home. *Id.* ¶ 16. Instead, he briefly stopped at a storage unit facility before heading toward the agreed meeting spot. *Id.* ¶¶ 15-16. Officers intercepted Desousa en route and placed him under arrest. *Id.* ¶ 16. Pursuant to Warrant I, officers searched Desousa's vehicle and seized methamphetamine and cocaine base. *Id.*

Officers also searched Desousa's cellphone and found an email indicating that he had rented a storage unit in the facility he had stopped at immediately prior to the arrest. *Id.* ¶ 17. With this information in hand, officers sought a second warrant (Warrant II) permitting the search of Desousa's storage unit, *id.* ¶ 31, which Magistrate Judge Boal issued. Warrant II (Dkt # 69-3). Subsequent searches of Desousa's home and storage unit resulted in the seizure of additional methamphetamine as well as other evidence of drug dealing. Gov't Opp'n (Dkt # 72) at 1.

## DISCUSSION

The Fourth Amendment, which protects individuals against unreasonable government searches and seizures, provides that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. A warrant is based on probable cause when "the affidavit upon which a warrant is founded demonstrates in some trustworthy fashion the likelihood that an offense has

been committed and that there is sound reason to believe that a particular search will turn up evidence of it." *United States v. Aguirre*, 839 F.2d 854, 857-858 (1st Cir. 1988). Probable cause means "reasonable cause," something significantly less exacting than "more likely than not" or "by a preponderance of the evidence." *United States v. Melvin*, 596 F.2d 492, 495 (1st Cir. 1979). "The standard of probable cause is the probability, not a *prima facie* showing, of criminal activity." *United States v. Ciampa*, 793 F.2d 19, 22 (1st Cir. 1986); *see also Safford v. Unified Sch. Dist. of Redding*, 557 U.S. 364, 371 (2009).

Whether a challenged warrant issued on a sufficient showing of probable cause is a question of law to be determined by the reviewing court. *Beck v. Ohio*, 379 U.S. 89, 96 (1964). In conducting such a review, the court's inquiry begins and ends with the "four corners of the affidavit." *United States v. Vigeant*, 176 F.3d 565, 569 (1st Cir. 1999). "An affidavit supporting a search warrant is presumptively valid." *United States v. Gifford*, 727 F.3d 92, 98 (1st Cir. 2013). And "[w]here, as here, a search is conducted pursuant to a warrant, the burden falls to the defendant to show the absence of probable cause by a preponderance of the evidence." *United States v. Heyer*, 2018 WL 6834591, at *1 (D. Mass. Dec. 27, 2018), citing *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

*(1) Warrant I – Desousa's Home*

Desousa contends that Warrant I is based on "stale" information and thus cannot support a finding of probable cause to search his home. Mot. (Dkt # 69) at 5. "[A]n affidavit supporting a search warrant must contain timely information or else it will fail." *United States v. Schaefer*, 87 F.3d 562, 568 (1st Cir. 1996); *see also Sgro v. United States*, 287 U.S. 206, 210-211 (1932). However, "[w]hen evaluating a claim of staleness, [courts] do not measure the timeliness of information simply by counting the number of days that have elapsed." *United States v. Morales-Aldahondo*, 524 F.3d 115, 119 (1st Cir. 2008). Rather, the court must "consider[ ] various factors, including 'the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information' in assessing the information's ripeness." *United States v. Tiem Trinh*, 665 F.3d 1, 13 (1st Cir. 2011), quoting *Morales-Aldahondo*, 524 F.3d at 119.

Where an affidavit details continuing criminal conduct, time is less of the essence. "[With] a mere isolated violation . . . it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance." *Commonwealth v. Vynorius*, 369 Mass. 17, 25 (1975), quoting *Bastilda v. Henderson*, 487 F.2d 860, 864 (5th Cir.

1973).  See *United States v. McElroy*, 587 F.3d 73, 78 (1st Cir. 2009) (three-year-old information regarding a payroll tax avoidance scheme refreshed by defendants' continuing withdrawals of large sums of cash); *United States v. Moscatiello*, 771 F.2d 589, 597 (1st Cir. 1985) (ongoing narcotics enterprise, year old information updated by contemporaneous surveillance); *United States v. Tucker*, 638 F.2d 1292, 1298-1299 (5th Cir. 1981) (information gathered over an eight month period on an organized crime gaming syndicate); *United States v. Dennis*, 625 F.2d 782, 792 (8th Cir. 1980) (three-months-old information, organized loan-sharking).

Here, the underlying facts support the inference that Desousa was an established drug dealer conducting an ongoing methamphetamine trafficking operation with customers in at least two states.[1]  Desousa's bank records revealed highly suspicious financial activity involving large and multiple deposits of money that had no apparent legitimate source.  Connerney Aff. I ¶¶ 40-42.  The fact that on each of the first three documented controlled purchases, Desousa either traveled from, stopped at, or returned to his home, *id.* ¶¶ 18, 20, 37, reasonably suggests – as the affiant

---

[1] As part of a larger ongoing investigation, the UC learned that Desousa was a source for methamphetamine and was able to acquire Desousa's cell phone number to arrange the four controlled purchases.  Connerney Aff. I ¶ 13.

concluded – that Desousa's home was likely to contain "evidence, fruits, and instrumentalities of drug distribution activities." *Id.* ¶ 63.

Significant authority supports the inference that an established and successful drug dealer is likely to keep drugs, proceeds, and records of drug dealing in his home. *See United States v. Dixon*, 787 F.3d 55, 59 (1st Cir. 2015) ("[I]n drug cases, there is often probable cause to believe that evidence of the crime will be found where the suspected drug dealer lives."). *See also* 2 LaFave, Search and Seizure, § 3.7(d) (2020); *United States v. Miggins*, 302 F.3d 384, 393-394 (6th Cir. 2002); *United States v. Whitner*, 219 F.3d 289, 297-299 (3d Cir. 2000) (collecting cases); *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999); *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993); *United States v. Gant*, 759 F.2d 484, 488 (5th Cir. 1985). Indeed, Desousa unconsciously parroted this line of authority prior to the second controlled purchase, when he informed the UC that he needed to "head to [his] spot" to pick up the UC's order and then stopped by his home on the way to the arranged meeting location. *Id.* ¶¶ 19-20.

In sum, the controlled purchases recited in the affidavit are not so temporally remote as to be considered stale. Although there was a months-long gap between the second and third controlled purchase, surveillance of Desousa's activities in the intervening period revealed an ongoing pattern of

travel and behavior consistent with Desousa's ongoing distribution of drugs. Connerney Aff. I ¶¶ 25-33. Finally, the third controlled purchase occurred but one week before officers sought the issuance of Warrant I. *Id.* ¶¶ 34-38. There is nothing to suggest that Desousa either moved from his home or abandoned his drug dealing scheme in the intervening seven days so as to render the affiant's information stale.[2]

*(2) Warrant II – Desousa's Storage Unit*

Desousa next challenges the validity of Warrant II, arguing that the supporting affidavit "fails to establish a nexus between the crime under investigation and the storage unit." Mot. at 3. This claim also falls short, as the affidavit readily demonstrates a connection between the place searched and the crime charged. On August 6, 2020, Desousa was viewed entering the building where his storage unit is located immediately before proceeding

---

[2] The court additionally recognizes that Warrant I sought certain tangible financial records concerning Desousa's suspected money laundering activities, including ledgers, receipts, and currency counting machines. *See* Warrant I at 4. While the presence of drugs in a particular location may – by the very nature of a drug distribution operation – be transitory, established drug dealers typically keep financial documents memorializing their transactions for their records. *See* Connerney Aff. I ¶¶ 44-45 ("drug traffickers often maintain such documents at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises"). Because the bank records examined by investigators were addressed to Desousa's home, investigators had good reason to believe that they would find relevant financial documents at that location. *Id.* ¶¶ 40-42.

toward the location of the drug transaction arranged by the officers. Connerney Aff. II ¶ 15. Notably, Desousa did not stop at his home at any time between his agreeing to a further sale of methamphetamine, *id.* ¶ 14, and his arrest while en route to the site of the proposed transaction, *id.* ¶ 16. Given that the investigation had until that point solely focused on Desousa's home as his storage spot for contraband, the officers reasonably deduced from Desousa's behavior on August 6, 2020, that the storage unit was likely a secondary repository for drugs. *Id.* ¶¶ 14-16. As the government points out in its opposition, Gov't Opp'n at 14, ample caselaw "supports the inference that an established drug dealer is likely to keep drugs, proceeds, and records of drug dealing on premises over which he has control." *United States v. Fletcher*, 2017 WL 5585716, at *4 (D. Mass. Nov. 20, 2017); *see* Connerney Aff. II ¶ 19 ("I am aware that . . . drug-related evidence [has] typically been recovered during searches of drug-traffickers' storage units as well as their residences[.]").

## ORDER

For the foregoing reasons, Desousa's motion to suppress must be and is <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

10